In the Matter of WILFRED D. MURTHA, Respondent, against GEORGE P. MONAGHAN, as Commissioner of the Harness Racing Commission of the State of New York, Appellant.

First Department, February 14, 1956.

*Daniel M. Cohen* of counsel (*James O. Moore, Jr.,* with him on the brief; *Jacob K. Javits, Attorney-General*), for appellant.

*Max M. Bernstein* for respondent.

BASTOW, J. The Commissioner of Harness Racing appeals from an order directing him to accept petitioner's application for a license as a mutuel clerk and to issue such license. The peti-

tioner is employed by the Board of Education, Union Free School District No. 23, in Nassau County, as a physical education teacher and receives an annual salary of $6,700. Between the years 1947 and 1953, except during absence in the military service, petitioner was employed as a mutuel clerk at Roosevelt Raceway.

In June, 1955, petitioner filed with the New York State Harness Racing Commission a written application for a license to act as a mutuel clerk. On June 28, 1955, by written communication, counsel for the commissioner informed petitioner that his application could not be accepted for the reason that he was a public employee earning in excess of $5,000 per year and therefore came within the ban of section 63 of the Pari-Mutuel Revenue Law (L. 1940, ch. 254, as amd.). Thereafter, this proceeding was commenced to compel the issuance of the license.

Before posing the legal problem to be determined, it might be helpful to sketch some of the statutory background against which this controversy arose. At the general election in 1939, by vote of the people, an amendment to section 9 of article I of the Constitution was approved vesting in the Legislature authority to prescribe for pari-mutuel betting on horse races. Thereafter, the Legislature enacted chapter 254 of the Laws of 1940 prescribing the conditions under which the pari-mutuel method of betting on horse races should be lawful. The enactment dealt with two types of racing— the first, running or flat racing and the second, harness or trotting racing. The act was supplemental to chapter 440 of the Laws of 1926, which was continued in full force except as inconsistent with the new law.

The 1926 enactment was applicable to both running and trotting races but the only provision for licensing required any corporation or association proposing to conduct running races or steeple chases to obtain a license from the State Racing Commission. (L. 1926, ch. 440, § 7.) Section 9 of the same law specifically exempted trotting associations from the licensing requirement. By section 5 of chapter 310 of the Laws of 1934 the 1926 act was amended by adding a new section 9-b mandating the Jockey Club to license owners, trainers and jockeys. The club was given permissive power to license such other persons " exercising their occupations or employed at race meetings ". These provisions, however, were applicable only to running races and not to trotting races. This particular provision was not disturbed by the general enactment of 1940 relating generally to pari-mutuel betting. Parenthetically, and for the sake of historical accuracy, this stated provision of the 1934 enactment was

struck down in *Matter of Fink* v. *Cole* (302 N. Y. 216, 225) on the ground that the delegation by the Legislature of its licensing power to the Jockey Club, a private corporation, was " such an abdication as to be patently an unconstitutional relinquishment of legislative power in violation of section 1 of Article III of the Constitution of this State ". Thereafter, the provision was repealed and a new section 9-b was enacted mandating the State Racing Commission to license " owners, trainers, assistant trainers and jockeys, jockey agents and stable employees" at running races and steeple chases. (L. 1951, ch. 324, § 4.) In 1952, this section was further amended to provide that natural persons only were to be licensed as owners and that such term should be deemed to include part owners and lessees. (L. 1952, ch. 77, § 1.)

Directing our attention to statutory provisions relating to trotting races, we find the first provision for the licensing thereof in the 1940 enactment. It was there provided that any association or corporation desiring to conduct harness race meetings at which pari-mutuel betting should be permitted was required to apply annually for the issuance of a license to the State Harness Racing Commission. (L. 1940, ch. 254, § 40.) In 1953, the Legislature provided for the licensing of participants and employees at harness race meetings. Chapter 254 of the Laws of 1940 was amended to add a new section, 41-a, providing that the State Harness Racing Commission "may license drivers and such other persons participating in harness horse race meets, as the commission may by rule prescribe, including, if the commission deem it necessary so to do, owners, and some or all persons exercising their occupation or employed at harness race meets." (L. 1953, ch. 391, § 8.)

To summarize the foregoing, we find that on January 1, 1954, there existed different licensing provisions for running races and harness racing. As to the former, any corporation or association desiring to hold running races or steeple chases was required to obtain a license annually from the State Racing Commission (L. 1926, ch. 440, § 7, as amd.). It was also mandatory, however, for an association or corporation desiring to conduct harness race meetings at which pari-mutuel betting was permitted to obtain an annual license (L. 1940, ch. 254, § 40, as amd.). It was further mandatory that owners, trainers, assistant trainers and jockeys, jockey agents and stable employees at running races and steeple chases be licensed. (L. 1926, ch. 440, § 9-b, as added by L. 1934, ch. 310, § 5, as amd.) On the other hand, the State Harness Racing Commission was given permissive power to

license drivers and such other persons participating in race meets as the commission might by rule prescribe, including owners and some or all persons exercising their occupation or employed at harness race meets. (L. 1940, ch. 254, § 41-a, as added by L. 1953, ch. 391, § 8.)

It should be noted that from 1940 to 1953 the Harness Racing Commission did not directly exercise its mandatory licensing powers. During these years the commission under a grant of general powers was given the right to " adopt the rules and regulations of The United States Trotting Association not inconsistent with this act to carry into effect its provisions." (L. 1940, ch. 254, § 36.) In the 1952 Interim Report of the New York State Joint Legislative Committee to Study All Laws, Rules and Regulations relative to Horse Racing (N. Y. Legis. Doc., 1952, No. 49), it was pointed out that the United States Trotting Association, a private corporation, was, in the practice which had prevailed with respect to the issuance of licenses, the counterpart of the Jockey Club in the field of running races. It was stated that all licenses in the harness racing area were issued by the Trotting Association. (Report, p. 23.) The committee, among its findings, stated that " [i]n harness racing, all licenses have heretofore been issued by the United States Trotting Association, a private corporation, which is the counterpart of the Jockey Club in flat racing, and under the principles of the *Fink* decision [*Fink* v. *Cole*, 302 N. Y. 216, heretofore discussed in this opinion] such licensing power cannot constitutionally be delegated to private agencies ". It was recommended that the harness racing law be amended to confer upon the Harness Racing Commission all licensing power. (Report, p. 82.) This was done at the next session of the Legislature (L. 1953, ch. 391, §§ 2, 8).

It appears that the Harness Racing Commission did not exercise permissive licensing powers also granted to it by this enactment because we find the Joint Legislative Committee returning to the subject of licensing in its 1954 final report (N. Y. Legis. Doc., 1954, No. 45). It was stated that " [t]his Committee sponsored legislation at the 1953 legislative session, which became chapter 391 of the Laws of 1953 (now section 7599-a of the Unconsolidated Laws), and was effective April 2, 1953. Under that law, the Harness Racing Commission was specifically authorized to license ' all persons exercising their occupation or employed at harness race meets.' The budgetary appropriation of the Harness Commission was increased by $25,000 for the purpose of providing the funds for putting the law into effect. For some unexplained reason, the Commission completely failed

up to this date to put this law into effect. This committee and the Legislature had thus fully recognized the need for screening track employees, and had provided the machinery for doing it. Had the Harness Racing Commission exercised the power given to it, many of the labor abuses would have been avoided. We recommend that the newly appointed Commissioner of Harness Racing put this licensing law into effect immediately.'' (Report, p. 25.) It appears that in response to the strong suggestion of this legislative committee, the Harness Racing Commission took some steps to license individuals. During the year 1954, it received 11,417 applications and of that number 230 persons were denied licenses for not being fit and proper persons or for other restrictions under the law. (Annual Report of New York State Harness Racing Commission, 1954, p. 11.) Research does not disclose, however, that this licensing was done pursuant to any prescribed rule as required by section 41-a. This conclusion is fortified by the 1955 Annual Report of the commission wherein it is stated that '' [e]arly in 1955 the Commission promulgated a rule requiring all persons employed or participating in harness racing to obtain an occupational license ''. (Annual Report of New York State Harness Racing Commission, 1955, p. 10; see, also, New York State Harness Racing Commission, Administrative Rule No. 4, adopted March 29, 1955, eff. April 1, 1955.) These facts are here stated so that there will be an understanding of the extensive used and unused licensing powers of the Harness Racing Commission, which have a pertinency in the consideration of the problem to be ultimately presented.

On October 10, 1953, the Governor, by an Executive Order promulgated under section 6 of the Executive Law, appointed a so-called Moreland Act Commission to make a thorough study of all phases of harness racing. This resulted in a series of enactments by the Legislature in 1954. (L. 1954, chs., 5, 510–515.) We are here concerned primarily with chapters 514 and 515. The former chapter amended chapter 254 of the Laws of 1940 by adding thereto a new section to be section 63. It provided in part as follows: '' 1. No public officer, public employee or party officer shall: (a) hold any license from the state racing commission or the state harness racing commission; or (b) own or hold, directly or indirectly, any proprietary interest, stock or obligation of any firm, association or corporation (1) which is licensed by either of such commissions to conduct pari-mutuel racing, or (2) which is licensed to conduct its occupation, trade, or business at race tracks at which pari-mutuel race meets are conducted, or (3) which owns or leases to any licensed association

or corporation a race track at which pari-mutuel racing is conducted, or (4) which participates in the management of any licensee conducting pari-mutuel racing; or (c) hold any office or employment with any firm, association or corporation specified in paragraph (b) of this subdivision; or (d) sell (or be a member of a firm, or own ten per centum or more of the stock of any corporation, which sells) any goods or services to any firm, association or corporation specified in paragraph (b) of this subdivision.''

This chapter contained four additional subdivisions that do not require consideration. At the same session, the Legislature adopted chapter 515 of the Laws of 1954. This amended the last-quoted enactment by adding subdivision 6 reading as follows: '' 6. The provisions of paragraph (c) of subdivision one of this section shall not apply to a public employee of a political subdivision (other than a police officer or paid employee of a police department, sheriff's office, district attorney's office or other law enforcement agency) whose compensation is less than five thousand dollars per annum if the local legislative body or other governing board or body of the political subdivision authorizes such employment by ordinance, resolution or local law.''

Directing our attention to section 63, insofar as it applies to harness racing, we find that paragraphs (a) through (c) set up the following prohibitions as to public officers, public employees and party officials. Paragraph (a) is a complete prohibition on holding a license. Paragraph (b) prohibits the ownership or holding of a proprietary interest in a firm, association or corporation doing certain things in connection with pari-mutuel racing as follows: (1) conduct such racing; (2) conduct its occupation, trade or business at such a race meet; (3) own or lease such a race track and (4) manage such a race track. Paragraph (c) prohibits the holding of any office or employment with any firm, association or corporation falling in these four last-described categories. The prohibition of paragraph (c) was relaxed by subdivision 6 to the extent that it was made inapplicable to a public employee of a political subdivision (with certain stated exceptions) whose compensation is less than $5,000 per annum if the appropriate local legislative body authorizes such employment by suitable enactment.

The intent of the Legislature in adopting these laws becomes plain in the light of the history of the licensing statutes applicable to the two racing commissions. There was first imposed a blanket prohibition on licensing public employees. It was apparent, however, that there were many race track jobs for which

no license was required or licensing by the commission was permissive. Therefore, the Legislature in effect said that public employees may not hold office or be employed by a firm or corporation that had a proprietary interest in (1) a track, (2) a business conducted at a track, (3) a landlord of a track or (4) the management of a track. However, if the compensation of such public employee was less than $5,000 and he had the approval of his public employer, then he might be employed by an employer falling in one of the four stated categories.

Moreover, if for reasons of convenience the commission determined not to license certain employees of employers described in clauses (1) through (4) of paragraph (b), the prohibition of paragraph (c) would still preclude public employees from accepting such employment. (Cf. L. 1954, ch. 510, § 5, the provisions of which authorized the fingerprinting of race track employees in the absence of licensing.) Conversely, all those persons who are or might fall within the prohibition of paragraph (a) are not within the prohibition of paragraph (c). As the title of section 41-a indicates, licenses are divided into two categories — those for " participants " and those for " employees." The statute lists " drivers " as participants and subdivision (b) of rule 4 of the administrative rules of the Harness Racing Commission lists participants as " owner, driver, trainer, assistant trainer or groom ". The persons so enumerated do not fall within the prohibition of paragraph (c) because they are not employed by a business enumerated in clauses (1) to (4) of paragraph (b). An owner is clearly not an employee of anyone. Similarly, drivers, trainers, assistant trainers or grooms, who are employees of an owner, are not employees of a business enumerated in clauses (1) through (4) of paragraph (b) since an owner is not within the enumerated activities of those clauses and for the further reason that an owner is not a " firm, association or corporation " within the meaning of that paragraph.

Directing our attention to the petitioner, we find that he is a public employee receiving a compensation of more than $5,000 annually and prior to 1954 he was employed as a mutuel clerk at a harness race track by a corporation which was licensed by the commission to conduct pari-mutuel racing. Chapter 514 of the Laws of 1954 when enacted contained two prohibitions that prevented him from obtaining a license. First, the absolute prohibition of paragraph (a) of subdivision 1 of section 63, and second, by the indirect prohibition of paragraph (c) thereof because he was employed by a corporation licensed to conduct pari-mutuel racing as provided in clause (1) of paragraph (b) of

subdivision 1 of the same section. Subdivision 6 could give him no relief because his annual compensation was in excess of $5,000.

In 1955 the Legislature further amended section 63 by adding a new subdivision, numbered 7. (L. 1955, ch. 815.) It is upon this amendment that petitioner relies in his present proceeding to compel the issuance of a license. The amendment is as follows: " 7. The provisions of paragraph (a) of subdivision one of this section shall not bar a public officer, public employee or party officer from holding any license issued by the state racing commission or the state harness racing commission if he was qualified to hold such a license on or prior to April sixth, nineteen hundred fifty-four."

It is the contention of petitioner, and Special Term so held, that it was the intent of the Legislature in the enactment of this subdivision to lift entirely the restrictive provisions imposed by section 63 upon a public employee, public officer or party officer; that having withdrawn the prohibition against the issuance of a license to such persons without restraint or limitation in paragraph (a) the Legislature intended to withdraw the restriction of paragraph (c) against the issuance of a license to such persons. We are unable to agree with these conclusions.

In the first place, subdivision 7 afforded relief to certain categories of public employees separate and apart from the category of petitioner. Thus, employees of municipalities, who were previously qualified for the benefits of subdivision 6, are now permitted to accept employment with an employer described in clauses (1) through (4) of paragraph (b) although the commission might require a license. Thus, let us assume that a public employee earning $3,000 annually was employed at the track as a salesman of soft drinks. He fell within the protection of subdivision 6 because his salary was less than $5,000 and his public employer by ordinance had authorized his employment at the track. If prior to the enactment of subdivision 7 the commission had decided to require a license for this type of work, he could not have received a license by reason of the prohibition in paragraph (a) of subdivision 1. Thus, the enactment of subdivision 7 removed the actual or potential prohibition of paragraph (a) as to those persons already exempt from the provisions of paragraph (c).

The more significant effect of subdivision 7 was to lift the prohibition of paragraph (a) in its entirety as it applied to owners, drivers and other "participants". As heretofore pointed out, the statute and rules of the Harness Racing Commis-

sion make a clear distinction between participants and employees. Contrary to the contention of the petitioner, participants do not fall within the provisions of paragraph (b) of section 63, which is applicable only to a proprietary interest in a firm, association or corporation. It seems clear, as heretofore more fully discussed, that an owner is not an employee of anyone. Similarly, drivers, trainers and grooms may be employees of an owner but they are not employees of firms, associations or corporations as described in paragraph (b) and therefore do not fall within the prohibition of paragraph (c). This is made even clearer when considered in the light of the statutory provisions relating to flat racing. The State Racing Commission may license natural persons only as owners. (L. 1926, ch. 440, § 9-b, as added by L. 1934, ch. 310, § 5, as amd.) Even if one strained to construe clause (2) of paragraph (b) to mean that an owner conducts his occupation at a race track, he is excluded from the provisions of the paragraph because it relates only to a " firm, association or corporation " and obviously a natural person is none of these.

It thus appears that a real benefit was bestowed upon public officials, public employees and party officials in certain areas by the enactment of subdivision 7. To state it concretely, a Sheriff of a county or the chairman of a political party may now hold a license as an owner. A county supervisor may hold a license as a trainer and an employee of a public highway department may be licensed as a groom. As to them, and those similarly situated, the ban has been lifted.

We have so far been considering the impact of subdivision 7 on harness racing. It should be pointed out, however, that the subdivision granted substantial relief to certain areas of flat racing. It has been heretofore set forth that from 1934 to 1951 the Jockey Club and since 1951 the State Racing Commission have been mandated by the Legislature to license owners, trainers, jockeys and certain other participants. The 1954 enactment of paragraph (a) of subdivision 1 of section 63 barred public officials, public employees and party officials from holding such licenses at flat tracks. The 1955 amendment, adding section 7, removed the ban if such persons were qualified to hold a flat track license as a participant prior to April 6, 1954. This gives real sense and meaning to the amendment because, as heretofore discussed, owners must be natural persons and they and their employees constitute a class separate and distinct from employees of firms, who own or manage a track, or, conduct pari-mutuel racing or a business or occupation at a race track.

The pattern of prohibition set down in section 63 in its present form may not commend itself to clarity but, contrary to the contention of petitioner, an absurd intent is not found in the 1955 amendment. We accept what is undenied — that petitioner is a decent, law-abiding citizen holding a responsible position in a school system in Nassau County. But this racing legislation was not aimed at him and those similarly situated. On March 15, 1954, the Governor sent a message to the Legislature in which some of the findings of the Moreland Commission were reviewed with particular reference to political ownership of race track stock. It was proposed that public officers and employees and political leaders be barred from owning any interest in a racing association licensed to conduct pari-mutuel meetings at harness tracks and running tracks. It was further proposed that such persons be prohibited from selling goods or services to any licensed racing association.

As we have seen, the Legislature, by chapters 510 through 515 of the Laws of 1954, adopted even more stringent prohibitions than those contained in this proposal. The category of described persons was prohibited from holding any license from either commission and from holding any office or employment with any firm, association or corporation having a proprietary interest in a track, a business conducted at a track, the owner of a track or the management thereof. The intent of the Legislature in adopting the latter provision is not difficult to ascertain. In effect, the Legislature said that not only were public officers, public employees and political leaders barred from having a proprietary interest in a race track or its operation but such owners and operators after the purge were barred from doling out jobs to those in the marked group. This is the group in which petitioner finds himself and as to this group the prohibition has not been lifted. Moreover, the Legislature apparently determined that an exception should be made under certain conditions as to local public employees whose annual salary was less than $5,000. Information may have been before the lawmakers that, for the most part, this group obtained employment in minor jobs at a track and generally their influence in public life was not such as to be of value or assistance to the track owners and operators.

On the other hand, the Legislature in 1955 may well have determined that as to participants, such as owners of horses, trainers and grooms, no reason existed for continuing the prohibition against public officials, public employees and party officials. In addition, the Legislature may have determined to

insure that persons already benefited by subdivision 6 of section 63 would not be prohibited from working at a track because the commission might require licenses for such employment.

There thus emerges a pattern which the Legislature has deliberately set out in something less than a clear manner in subdivisions 1, 6 and 7 of section 63. The petitioner, who earns $6,700 a year, is now barred from employment as a pari-mutuel clerk by the prohibition of paragraph (c) although the prohibition of paragraph (a) has been lifted by subdivision 7. Moreover, the petitioner is not affected by subdivision 6 because his salary exceeds $5,000 and there is no proof that his public employer has authorized his employment as a mutuel clerk. If, as petitioner contends, subdivision 6 is unconstitutional because it is unreasonable or fails to provide equal protection, the effect would be to invalidate chapter 515 of the Laws of 1954. Paragraph (c), which is the provision of law precluding petitioner from obtaining a license, was enacted in chapter 514 of the Laws of 1954. Accordingly, the petitioner, not being aggrieved thereby, lacks the standing to challenge the constitutionality of chapter 515 of the Laws of 1954.

The order appealed from should be reversed and the petition dismissed.

BREITEL, J. P., BOTEIN, RABIN and BERGAN, JJ., concur.

Order unanimously reversed, with $20 costs and disbursements to the appellant, and the petition dismissed. Settle order on notice.